J-S37040-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :    IN THE SUPERIOR COURT OF
                                      :           PENNSYLVANIA
                                        :
             v.                          :
                                        :
                                        :
MICHAEL BRADY OWENS             : 
                                        :
          Appellant                :      No. 19 EDA 2022

Appeal from the Judgment of Sentence Entered November 18, 2021
In the Court of Common Pleas of Monroe County Criminal Division at
No(s):  CP-45-CR-0001095-2018

BEFORE:  BOWES, J., LAZARUS, J., and OLSON, J.

MEMORANDUM BY OLSON, J.:                     **FILED APRIL 12, 2023**

Appellant, Michael Brady Owens, appeals from the judgment of sentence entered on November 18, 2021.  We affirm.

The trial court ably summarized the underlying facts of this case:

> on March 16, 2016, McMichael's Hunting Club members discovered burnt human remains on State Game Lands 38, later identified as Demetria Hughes [(hereinafter "the Victim")].  An autopsy on the Victim determined that the cause of death was a gunshot wound to the head.  On March 21, 2016, Pennsylvania State Troopers conducted an interview with [Appellant's co-defendant,] Randy Criste-Troutman [(hereinafter "Co-Defendant Criste-Troutman"),] at the Lackawanna County Prison.  He related the Victim was an associate of his in dealing heroin and owed him in excess of $1,000.00 for illegal drugs. [Co-Defendant] Criste-Troutman related that he used a ruse to lure the [Victim] into the woods in order to kill him. Specifically, [Co-Defendant] Criste-Troutman told the Victim they would commit a home invasion robbery and the Victim agreed to participate.  [Co-Defendant] Criste-Troutman further related that [Appellant] helped lure the [Victim] with

the robbery ruse. [Co-Defendant] Criste-Troutman related that Appellant shot and killed the Victim in the woods.

On April 26, 2016, Appellant gave sworn testimony to the Monroe County Investigating Grand Jury. During his testimony, Appellant admitted to knowing the Victim, and knew the Victim and [Co-Defendant] Criste-Troutman to be associates. Moreover, Appellant knew [Co-Defendant] Criste-Troutman was involved in the sale of illegal drugs, specifically heroin. Appellant related that [Co-Defendant] Criste-Troutman contacted him and asked to help drop off a friend. Appellant stated that he picked up [Co-Defendant] Criste-Troutman and was advised that the Victim was that friend. Appellant related that he drove [Co-Defendant] Criste-Troutman and the Victim to a wooded area, that [Co-Defendant] Criste-Troutman and the Victim exited the vehicle, and that after a period of time [Co-Defendant] Criste-Troutman returned alone. Appellant advised that he returned to the same spot with [Co-Defendant] Criste-Troutman between one and three days later. Appellant further advised [Co-Defendant] Criste-Troutman brought a gas can filled with gasoline on the return trip.

Finally, cell phone tracking evidence supports finding that: (1) Appellant accompanied [Co-Defendant] Criste-Troutman and the Victim to the scene of the murder on the date the murder occurred; (2) Appellant and [Co-Defendant] Criste-Troutman returned to the scene of the crime that night; and (3) Appellant and [Co-Defendant] Criste-Troutman returned to the scene of the crime three days later. Moreover, Appellant and [Co-Defendant] Criste-Troutman were in frequent contact via text message communications during this time period.

Trial Court Opinion, 2/7/22, at 36-37 (citations omitted).

A jury found Appellant guilty of a number of crimes, including first-degree murder, criminal conspiracy, tampering with or fabricating physical evidence, and abuse of a corpse.[1] On November 18, 2021, the trial

---

[1] 18 Pa.C.S.A. §§ 2502(a), 903(a)(1), 4910(1), and 5510, respectively.

- 2 -

court sentenced Appellant to serve an aggregate term of life in prison without the possibility of parole, with a consecutive term of 256 to 552 months in prison, for his convictions.

Appellant filed a timely notice of appeal. He numbers four claims on appeal:

> 1. Whether, pre-trial, the court erred when it ruled [Appellant] was precluded from receiving the mental health report evaluating [Co-Defendant Criste-Troutman,] and containing exculpatory statements for Appellant?
>
> 2. Whether, pre-trial, the court erred when it failed to grant [Appellant's] motion to dismiss pursuant to [Pennsylvania Rule of Criminal Procedure] 600?
>
> 3. Whether, at trial, the court erred where it precluded [Appellant] from cross-examining [Co-Defendant Criste-Troutman] on statements he had made during his mental health evaluation?
>
> 4. Whether, at trial, the court erred when it overruled objections to [Pennsylvania Rule of Evidence] 404(b) [] that [Appellant] had previously "beat a body," which statements were offered through Detectives Thomas McAndrew and Wendy Serfass, and where this evidence's probative value did not substantially outweigh its potential for unfair prejudice, where it was not relevant for any permissible purpose, and where the Commonwealth had provided no notice and failed to meet a court-imposed deadline for notice of 404(b) evidence prior to trial?

Appellant's Brief at 6-7.

We have reviewed the briefs of the parties, the relevant law, the certified record, the notes of testimony, and the opinion of the able trial court judge, the Honorable Margherita Patti-Worthington. We conclude that Appellant is not entitled to relief in this case, for the reasons expressed in President Judge

- 3 -

Patti-Worthington's August 16, 2021 and February 7, 2022 opinions. Therefore, we affirm on the basis of President Judge Patti-Worthington's thorough opinions and adopt them as our own. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of President Judge Patti-Worthington's August 16, 2021 and February 7, 2022 opinions.

Although we adopt the trial court's opinions as our own, we specifically address Appellant's first and third claims on appeal which challenge the trial court's rulings precluding Appellant from receiving the mental health evaluation reports of Co-Defendant Criste-Troutman, and further precluding Appellant from cross-examining Co-Defendant Criste-Troutman on statements he made during the mental health evaluations. In its opinion, the trial court thoroughly and ably explained why Appellant's claims fail. *See* Trial Court Opinion, 2/7/22, at 3-20. We further note that our opinions in **Commonwealth v. Nuzzo**, 284 A.3d 1243 (Pa. Super. 2022) and **Commonwealth v. Segarra**, 228 A.3d 943 (Pa. Super. 2020) foreclose Appellant's ability to obtain relief on these claims.

In the case at bar, the trial court ordered Co-Defendant Criste-Troutman to undergo incompetency evaluations, pursuant to 50 P.S. § 7402 of the Mental Health Procedures Act ("MHPA"). Section 7402 of the MHPA declares:

> **§ 7402. Incompetence to proceed on criminal charges and lack of criminal responsibility as defense**

- 4 -

**(a) Definition of Incompetency.**--Whenever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

. . .

**(c) Application for Incompetency Examination.**--Application to the court for an order directing an incompetency examination may be presented by an attorney for the Commonwealth, a person charged with a crime, his counsel, or the warden or other official in charge of the institution or place in which he is detained. A person charged with crime shall be represented either by counsel of his selection or by court-appointed counsel.

**(d) Hearing; When Required.**--The court, either on application or on its own motion, may order an incompetency examination at any stage in the proceedings and may do so without a hearing unless the examination is objected to by the person charged with a crime or by his counsel. In such event, an examination shall be ordered only after determination upon a hearing that there is a *prima facie* question of incompetency. Upon completion of the examination, a determination of incompetency shall be made by the court where incompetency is established by a preponderance of the evidence.

**(e) Conduct of Examination; Report.**--When ordered by the court, an incompetency examination shall take place under the following conditions:

(1) It shall be conducted as an outpatient examination unless an inpatient examination is, or has been, authorized under another provision of this act.

(2) It shall be conducted by at least one psychiatrist or licensed psychologist and may relate both to competency to proceed and to criminal responsibility for the crime charged.

(3) The person shall be entitled to have counsel present with him and shall not be required to answer any questions or to perform tests unless he has moved for or agreed to the examination. Nothing said or done by such person during the

examination may be used as evidence against him in any criminal proceedings on any issue other than that of his mental condition.

(4) A report shall be submitted to the court and to counsel and shall contain a description of the examination, which shall include:

(i) diagnosis of the person's mental condition;

(ii) an opinion as to his capacity to understand the nature and object of the criminal proceedings against him and to assist in his defense;

(iii) when so requested, an opinion as to his mental condition in relation to the standards for criminal responsibility as then provided by law if it appears that the facts concerning his mental condition may also be relevant to the question of legal responsibility; and

(iv) when so requested, an opinion as to whether he had the capacity to have a particular state of mind, where such state of mind is a required element of the criminal charge.

. . .

50 P.S. § 7402.

In **Nuzzo**, this Court held that a competency petition and its attached materials – as filed under 50 P.S. § 7402 – are "documents concerning persons in treatment," and are thus encompassed within the MHPA's general "confidentiality of records" provision, "when the petition contains factual averments and materials offered in support of the *prima facie* showing of incompetency and which refer, reflect, or relate, *inter alia*, to mental health treatment and diagnosis records, including, but not limited to, names of physicians and treatment facilities, hospitalizations, medical opinions or

diagnosis (including medical records, letters, and charts), and current or recommended courses of treatment." ***Nuzzo***, 284 A.3d at 1256 (emphasis omitted). The MHPA's "confidentiality of records" provision, contained at 50 P.S. § 7111, declares:

> (a) All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:
>
>> (1) those engaged in providing treatment for the person;
>>
>> (2) the county administrator, pursuant to section 110;
>>
>> (3) a court in the course of legal proceedings authorized by this act;
>>
>> (4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency; and
>>
>> (5) a covered entity or a covered entity's business associate that makes the use, disclosure or request for disclosure in accordance with 45 CFR Pt. 164 Subpt. E2 (relating to privacy of individually identifiable health information).
>
> In no event, however, shall privileged communications, whether written or oral, be disclosed to anyone without such written consent. . . .

50 P.S. § 7111.

As this Court explained in ***Segarra***:

> In construing [s]ection 7111, our [Supreme] Court determined that, by its clear and unambiguous terms, disclosure was allowed only in certain limited enumerated instances, and only to parties designated by the statute. . . . Apart from these express exceptions, our Court held that disclosure is permitted to third parties only where the patient has given his or her written consent:

- 7 -

The unambiguous terms contained in the provision regarding the confidentiality of medical records leaves little room for doubt as to the intent of the Legislature regarding this section. . . . "[A]ll documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone." 50 P.S. § 7111(a). The provision applies to all documents regarding one's treatment, not just medical records. Furthermore, the verbiage that the documents "shall be kept confidential" is plainly not discretionary but mandatory in this context — it is a requirement. The release of the documents is contingent upon the person's written consent and the documents may not be released "to anyone" without such consent. The terms of the provision are eminently clear and unmistakable and the core meaning of this confidentiality section of the [MHPA] is without doubt — there shall be no disclosure of the treatment documents to anyone.

*Zane v. Friends Hosp.*, 836 A.2d 25, 31-32 (Pa. 2003).

*Segarra*, 228 A.3d at 951-952 (some quotation marks omitted), *quoting **In re Fortieth Statewide Investigating Grand Jury***, 220 A.3d 558, 566-567 (Pa. 2019).

Section 7111(a)(3) exempts from the general confidentiality mandate "a court in the course of legal proceedings authorized by this act." 50 P.S. § 7111(a)(3). However, as this Court has held, "a criminal prosecution is not a legal proceeding authorized by the act" and, thus, does not fall under the general confidentiality exception. *Segarra*, 228 A.3d at 953 (quotation marks, citations, and corrections omitted). As we explained:

A strict construction of Section 7111 reveals that all documents concerning persons in treatment are to be kept confidential and may not be released or disclosed to anyone, absent the patient's written consent, with certain exceptions. The third exception to

the privilege of confidentiality conferred by the MHPA on a patient's records allows a court to review the records **in the course of legal proceedings authorized by the MHPA**. 50 P.S. § 7111(3).

The unambiguous language of section 7111(3) leads us to conclude that a patient's inpatient mental health treatment records may be used by a court **only** when the legal proceedings being conducted are **within the framework** of the MHPA, that is, involuntary and voluntary mental health commitment proceedings. **See** 50 P.S. § 7103 (MHPA establishes the rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons). We can find no language within the act itself which includes criminal proceedings within the framework of the act, nor can we find any caselaw in the Commonwealth which supports such a proposition.

Absent any authority to the contrary, we conclude that a criminal prosecution is not a legal proceeding authorized by the act.

*Segarra*, 228 A.3d at 952-953 (quotation marks and corrections omitted) (emphasis in original), *quoting* ***Commonwealth v. Moyer***, 595 A.2d 1177, 1179 (Pa. Super. 1991).

On appeal, Appellant claims that he should have been able to receive the mental health evaluation reports of Co-Defendant Criste-Troutman. He also claims that he should have been able to cross-examine Co-Defendant Criste-Troutman on statements he made during his mental health evaluations, some of which were placed into evidence during Co-Defendant Criste-Troutman's incompetency hearings. ***See*** Appellant's Brief at 17-30. However, the mental health evaluation reports and incompetency hearings were all ordered by the trial court and conducted in accordance with 50 P.S. § 7402. As explained above, in ***Nuzzo***, this Court held that a competency

petition and its attached materials – as filed under 50 P.S. § 7402 – are "documents concerning persons in treatment," and are thus encompassed within the MHPA's general "confidentiality of records" provision, "when the petition contains factual averments and materials offered in support of the *prima facie* showing of incompetency and which refer, reflect, or relate, *inter alia*, to mental health treatment and diagnosis records, including, but not limited to, names of physicians and treatment facilities, hospitalizations, medical opinions or diagnosis (including medical records, letters, and charts), and current or recommended courses of treatment." ***Nuzzo***, 284 A.3d at 1256 (emphasis omitted). By definition, Co-Defendant Criste-Troutman's mental health evaluation reports and incompetency hearings "refer, reflect, or relate [to Co-Defendant Criste-Troutman's] mental health . . . diagnosis records." ***See id.***; ***see also*** 50 P.S. § 7402(e)(4) ("[a mental health evaluation] report shall be submitted to the court and to counsel and shall contain a description of the examination, which shall include . . . [a] **diagnosis of the person's mental condition**") (emphasis added). Thus, as in ***Nuzzo***, Co-Defendant Criste-Troutman's mental health evaluation reports and incompetency hearing transcripts are "documents concerning persons in treatment," and are thus encompassed within the MHPA's general "confidentiality of records" provision.

Further, pursuant to **Segarra** and the plain language of Section 7111, Co-Defendant Criste-Troutman's records must "be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone." 50 P.S. § 7111. Co-Defendant Criste-Troutman has not given his written consent. Therefore, in accordance with **Segarra**, Appellant is not entitled to receive Co-Defendant Criste-Troutman's mental health evaluation reports or cross-examine him on the statements he made during these mental health evaluations. **See Segarra**, 228 A.3d at 953 (holding: "a criminal prosecution is not a legal proceeding authorized by the act" and, thus, does not fall under Section 7111(a)(3)'s exception to the general confidentiality requirement). Appellant's claim to the contrary thus fails.

Judgment of sentence affirmed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/12/2023

- 11 -

COURT OF COMMON PLEAS OF MONROE COUNTY
FORTY-THIRD JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

| COMMONWEALTH OF PENNSYLVANIA | : 1095 CR 2018 |
|---|---|
| | : |
| v. | : 19 EDA 2022 |
| | : |
| MICHAEL OWENS, | : |
| Defendant. | : APPEAL |

STATEMENT PURSUANT TO Pa. R.A.P. 1925(a)

We submit this statement in response to Michael Owens' ("Appellant") appeal from this Court's judgment of sentence dated November 18, 2021. The relevant procedural history of this case is as follows:

On February 18, 2016, Appellant and Randy Criste-Troutman ("co-defendant") lured Demetrio Hughes ("Victim") to a wooded area and shot him, resulting in his death. Thereafter, Appellant and co-defendant returned to the scene and set the Victim's corpse on fire in an attempt to cover up their involvement in the murder. On November 21, 2017, Appellant was charged by Criminal Complaint with one open count of Criminal Homicide,[1] and one count each of Criminal Conspiracy Engaging in Criminal Homicide,[2] Tamper With/Fabricate Physical Evidence,[3] Criminal Conspiracy—Tamper With/Fabricate Physical Evidence,[4] Abuse of Corpse,[5] Criminal Conspiracy Engaging—Abuse of Corpse,[6] and Manufacture, Delivery, or Possession with Intent to Manufacture or Deliver.[7] On September 20, 2018, Appellant was joined for trial

---

[1] 18 Pa.C.S.A. § 2501(a).
[2] 18 Pa.C.S.A. § 903(a)(1).
[3] 18 Pa.C.S.A. § 4910(1).
[4] 18 Pa.C.S.A. § 903(a)(1).
[5] 18 Pa.C.S.A. § 5510.
[6] 18 Pa.C.S.A. § 903(a)(1).
[7] 35 Pa.C.S.A. § 780-113(a)(30).

with co-defendant Randy Criste-Troutman. That same day, the Criminal Information was filed listing the above-enumerated charges.

On September 22, 2021, after trial by jury, Appellant was convicted of Criminal Homicide–Murder in the First Degree, Criminal Conspiracy–Murder in the First Degree, Tamper With/Fabricate Physical Evidence, Criminal Conspiracy–Tamper With/Fabricate Physical Evidence, Abuse of Corpse, and Criminal Conspiracy Engaging–Abuse of Corpse.[8] On November 18, 2021, we sentenced Appellant to an aggregate period of incarceration of life in prison without the possibility of parole, and a consecutive term of 256 to 552 months incarceration in a State Correctional Institution. *See* Sentencing Order, 11/18/21, pp. 1–3. Appellant did not file Post-Sentence Motions.

On December 16, 2021, Appellant timely filed his Notice of Appeal. On December 17, 2021, we filed an Order directing Appellant to file a Concise Statement pursuant to Pa. R.A.P. 1925(b). On January 6, 2022, we timely received Appellant's Concise Statement which contained the following alleged errors: (1) this Court erred "where it ruled [pre-trial] that the [Appellant] was precluded from receiving the mental health report evaluating co-defendant and containing exculpatory statements for [Appellant];" (2) this Court erred "when it failed to grant [Appellant]'s [pre-trial] motion to dismiss pursuant to Pa. [R. Crim. P.] 600;" (3) this Court erred "where it precluded the [Appellant] from cross-examining the co-defendant on statements he had made during his mental health evaluation;" and (4) this Court erred "when [at trial] it overruled objections to 404(b) evidence that the [Appellant] had previously 'beat a body', which statements were offered through Detective Thomas McAndrew and Wendy Serfass, and where

---

[8] We note Count 7 of the Criminal Information, Manufacture, Delivery, or Possession With Intent to Manufacture of Deliver, 18 Pa. C.S.A. § 780-113(A)(30), was dismissed by Court Order dated September 21, 2021, following Motion by Defendant that same be dismissed, and with no opposition from the Commonwealth.

this evidence's probative value did not substantially outweigh its potential for unfair prejudice, where it was not relevant for any permissible purpose, and where the Commonwealth had provided no notice and failed to meet a court-imposed deadline for notice under 404(b) evidence prior to trial. *See* Statement of Errors, 1/6/22, pp. 1–2. We address each in turn.

In his first appeal issue, Appellant alleges this Court erred when it ruled pretrial that Appellant was precluded from receiving co-defendant's mental health records produced under the Mental Health and Procedures Act ("MHPA"), 50 P.S. § 7101 *et seq.* This issue is without merit. Before we address Appellant's arguments, we believe it prudent to provide a timeline of co-defendant's competency evaluations and proceedings under the MHPA. In our April 1, 2021 Competency Order we provide a comprehensive timeline of co-defendant Criste-Troutman's competency proceedings. Said Order is attached hereto, and we rely on the factual and procedural background discussed therein. To summarize the findings in the Competency Order:

On September 14, 2018, co-defendant Randy Criste-Troutman was evaluated by Dr. William Hocter, MD, to determine his competency to stand trial. Neither party requested this Court schedule a hearing on Criste-Troutman's competency. As such, no hearing was held and a final competency determination was not issued.

On February 26, 2019, the Commonwealth filed a Motion for Competency Hearing requesting Criste-Troutman be re-evaluated by Dr. Hocter. On February 27, 2019, Criste-Troutman was re-evaluated by Dr. Hocter to assess his competency. In his report, Dr. Hocter found Criste-Troutman met the criteria for capacity to proceed to trial. At a hearing on May 20, 2019, Dr. Hocter testified credibly and maintained his position that Criste-Troutman was competent to proceed to trial. Upon Criste-Troutman's request, the record remained open for additional evidence and a separate competency examination. Criste-Troutman made this request

3

due to his stated deteriorating mental health and the conflicting conclusions in Dr. Hocter's reports. As a result, this Court held the matter under advisement and did not issue a competency determination.

On June 12, 2019, Criste-Troutman was evaluated by Dr. T. David Newman, PhD. In his report, Dr. Newman concluded that Criste-Troutman was not competent to stand trial. At a hearing on August 6, 2019, Dr. Newman testified credibly and maintained his position that Criste-Troutman was incompetent to stand trial. By Order dated August 6, 2019, this Court found Criste-Troutman was incompetent to stand trial pursuant to 50 P.S. § 7402(a). The proceedings were stayed and Criste-Troutman was committed to Torrance State Hospital.

On January 22, 2020, a report was provided by Torrance State Hospital indicating that Criste-Troutman regained competency. As a result, Criste-Troutman was returned to SCI Pine Grove. On February 1, 2021, Criste-Troutman's counsel Syzane Arifaj, Esq., filed a Motion for Competency Evaluation arguing Criste-Troutman had decompensated and refused any contact with counsel. On February 3, 2021, this Court Ordered Criste-Troutman undergo a competency evaluation.

On February 3, 2021, Criste-Troutman was evaluated by Dr. Douglas Contri, Jr., Psy.D. In his report, Dr. Contri concluded Criste-Troutman was incompetent to proceed to trial. At a hearing in this matter on March 30, 2021, Dr. Contri testified credibly and maintained his position. At said hearing, Criste-Troutman, who was present via video conferencing technology, exhibited a large and grotesque wound with dried blood on his forehead. Jail staff indicated the wound was self-inflicted.

Based on the foregoing, this Court found that Criste-Troutman posed a clear and present danger to himself as defined in the MHPA at 50 P.S. § 7301. As such, we found Criste-Troutman

4

subject to the provisions of § 7301 and authorized involuntary examination and treatment. In addition, we found Criste-Troutman met his burden of establishing incompetence to proceed, and he was deemed incompetent to stand trial. Once again, Criste-Troutman was committed to Torrance State Hospital.

On June 7, 2021, Criste-Troutman was evaluated by Dr. Kelly Chamberlain, PsyD. In her report, Dr. Chamberlain concluded Criste-Troutman regained competency to stand trial. At a hearing in this matter on July 27, 2021, Dr. Chamberlain testified credibly and maintained her position. By Order dated September 1, 2021, this Court found Criste-Troutman competent to stand trial, the proceedings were resumed, and Criste-Troutman was returned to the Monroe County Correctional Facility.

Examining this timeline, **all** examinations and evaluations performed on Criste-Troutman were ordered by this Court and conducted pursuant to the provisions of the Pennsylvania Mental Health Procedures Act, 50 P.S. § 7101 *et seq.* As such, any question whether the challenged evaluations, and any related records, fall under the purview of the MHPA is a nullity. Appellant's challenge is solely to the confidentiality provisions contained in the MHPA and does not invoke other well-established confidentiality privileges such as psychiatrist/psychologist-patient privilege.

We now turn to Appellant's *Motion to Compel*. Appellant filed said *Motion* on November 11, 2019 and requested this Court "enter an Order compelling the Commonwealth to provide defense counsel with copies of all mental health evaluations [under the MHPA] of [co-defendant]." *Motion to Compel*, 11/11/19, p. 2. Appellant argued, "the results of [the] mental health evaluations are an important part of the discovery requested in this matter by [Appellant] in order to prepare for trial." *Id.* at 1. The crux of Appellant's argument is that the confidentiality

5

protections afforded by the MHPA do not apply, were waived, or should give way to Appellant's right to receive material or exculpatory evidence during discovery. On December 9, 2019, we held a hearing on the *Motion*, heard arguments of counsel, and ordered briefs. Both parties timely filed responsive briefs.

In his Brief, Appellant raised five arguments: (1) 50 P.S. Sec. 7402(e)(3) does not protect the records from disclosure in discovery; (2) the records are not protected by 50 P.S. Sec. 7111; (3) Discovery rules require disclosure of the reports because they are documents material to the case and favorable to the accused on the issue of guilt; (4) even if the reports are confidential, they should be turned over pursuant to *Ritchie* and *Brady*; and (5) the examinations were unsealed in a public hearing and are subject to the public records exception. By way of relief, Appellant requested this Court order all mental health evaluations and related documents be turned over for review. In the alternative, Appellant requested this Court conduct an *in camera* review of said evidence to determine materiality. *See* Brief in Support, 12/13/19, pp. 1-8.

In response, the Commonwealth relied on the plain language of 50 P.S. Sec. 7402 to argue release of the challenged records should be barred under the MHPA. The Commonwealth argued the confidentiality provisions of the MHPA are absolute and no exceptions applied under the facts. *See* Brief in Opposition, 12/13/19, pp. 1-3.

We need not address Appellant's arguments individually. In *Commonwealth v. Segarra*, our Superior Court provided clear and controlling guidance on how to assess a challenge to the confidentiality provisions of the MHPA. 228 A.3d 943 (Pa. Super. 2020). In *Segarra*, a defendant charged with rape moved to compel discovery of MHPA records from the victim's mental health treatment at a clinic. The trial court ordered a child advocate to review the victim's

6

mental health records and the child advocate appealed arguing the records were protected under the MHPA and not subject to review.

On review, the Superior Court first addressed the threshold issue of statutory privilege and found the victim's mental health records were protected by the MHPA. *Id.* at 949.[9] Next, the *Segarra* court turned to the general confidentiality provision of the MHPA, 50 P.S. Sec. 7111. Section 7111 of the MHPA "mandates that all documentation concerning persons in treatment be kept confidential, in the absence of patient consent, except in four limited circumstances." *Zane v. Friends Hosp.*, 575 Pa. 236, 836 A.2d 25, 31 (2003); *see also In re Fortieth Statewide Investigating Grand Jury*, 220 A.3d 558, 566-67 (Pa. 2019). Section 7111 provides as follows:

> (a) All documents concerning persons in treatment shall be kept confidential and, without the person's written consent, may not be released or their contents disclosed to anyone except:
>
> (1) those engaged in providing treatment for the person;
>
> (2) the county administrator, pursuant to [50 P.S. § 7110];
>
> (3) a court in the course of legal proceedings authorized by this act; and
>
> (4) pursuant to Federal rules, statutes and regulations governing disclosure of patient information where treatment is undertaken in a Federal agency.
>
> In no event, however, shall privileged communications, whether written or oral, be disclosed to anyone without such written consent. This shall not restrict the collection and analysis of clinical or statistical data by the department, the county administrator or the facility so long as the use and dissemination of such data does not identify individual patients. Nothing herein shall be construed to conflict with section 8 of the act of April 14, 1972 (P.L. 221, No. 63),

---

[9] Although the evaluations were not court ordered, the victim received inpatient treatment at a qualified facility and satisfied the threshold requirements of the MHPA.

7

known as the 'Pennsylvania Drug and Alcohol Abuse Control
Act.'

50 P.S. § 7111(a).

Reviewing Section 7111, the *Segarra* court continued, "[h]aving determined that the

MHPA applies, we must examine whether any of the exceptions enumerated in subsection

7111(a) applies." *Id.* at 952. With respect to the 7111 exceptions, the court noted:

> In construing [s]ection 7111, our [Supreme] Court determined that,
> by its clear and unambiguous terms, disclosure was allowed only
> in certain limited enumerated instances, and only to
> parties designated by the statute.... Apart from these express
> exceptions, our Court held that disclosure is permitted to third
> parties only where the patient has given his or her written consent.
> The unambiguous terms contained in the provision regarding the
> confidentiality of medical records leaves little room for doubt as to
> the intent of the Legislature regarding this section...."[A]ll
> documents concerning persons in treatment shall be kept
> confidential and, without the person's written consent, may not be
> released or their contents disclosed to anyone." 50 P.S. § 7111(a).
> The provision applies to all documents regarding one's treatment,
> not just medical records. Furthermore, the verbiage that the
> documents "shall be kept confidential" is plainly not discretionary
> but mandatory in this context—it is a requirement. The release of
> the documents is contingent upon the person's written consent and
> the documents may not be released "to anyone" without such
> consent. The terms of the provision are eminently clear and
> unmistakable and the core meaning of this confidentiality section
> of the [MHPA] is without doubt—there shall be no disclosure of
> the treatment documents to anyone.

*Id.*, citing *In re Fortieth Statewide Investigating Grand Jury*, 220 A.3d at 566-67 (citations

omitted).

Applying this standard, the *Segarra* court found:

> [N]one of the enumerated exceptions set forth in subsection
> 7111(a) applies, and there is no question that [the victim] did not
> give written consent for the disclosure of her mental health
> records. The documents are not sought by one treating the person
> or by a county administrator, nor is there any suggestion that any
> treatment was undertaken in a federal agency. *See* 50 P.S. §

8

> 7111(a)(1), (2), (4). Further, disclosure to a court is not permitted
> in criminal proceedings under the MHPA; rather, it
> is only permitted where the legal proceedings are authorized by the
> MHPA. 50 P.S. § 7111(a)(3).

*Segarra*, 228 A.3d at 152. Next, the court addressed the 7111(a)(3) exception for a court in the course of legal proceedings authorized by the MHPA, stating:

> The unambiguous language of section 7111(a)(3) leads us to conclude that a patient's inpatient mental health treatment records may be used by a court only when the legal proceedings being conducted are within the framework of the MHPA, that is, involuntary and voluntary mental health commitment proceedings. *See* 50 P.S. § 7103 (MHPA establishes the rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons). We can find no language within the act itself which includes criminal proceedings within the framework of the act, nor can we find any caselaw in the Commonwealth which supports such a proposition.
>
> * * *
>
> [A]bsent any authority to the contrary, **we conclude that [a] criminal prosecution [ ] is not a legal proceeding authorized by the act.**

*Id.* at 952-53 (emphasis added); *see also Zane v. Friends Hosp.*, 575 Pa. 236, 836 A.2d at 32-33 (2003) ("[B]y the clear terms of the statute, disclosure to a court is not permitted in any legal proceedings, but only in those legal proceedings authorized by the [MHPA]. Our review of the [MHPA] reveals certain legal proceedings that are authorized by the statute, that is, proceedings falling within the confines of the act. These include involuntary emergency treatment, 50 P.S. § 7303; court-ordered involuntary treatment, 50 P.S. § 7304 and § 7305; transfer of persons in involuntary treatment, 50 P.S. § 7306; and voluntary mental health commitment determinations, 50 P.S. § 7204 and § 7206.").

With the foregoing in mind, the *Segarra* court determined no exceptions to Section 7111 applied. As such, the court concluded:

9

> Thus, in this case, by the plain language of the
> MHPA, **all** documents relating to [the victim's] mental health
> treatment at the [] Clinic **shall** be kept confidential and cannot be
> released to anyone absent [the victim's] written consent.
> Accordingly, the trial court's order requiring Child Advocate to
> review [the victim's] mental health records and disclose any
> impeachment evidence to the trial court, and possibly to Segarra
> and the Commonwealth, was erroneous. Likewise, it was error for
> the trial court to leave the door open to a possible *in
> camera* review by the trial judge, as the MHPA prohibits the
> release of [the victim's] mental health records to **anyone** without
> her written consent.
>
> Because the MHPA protects **all** documents from disclosure, a
> detailed discussion of whether the psychiatrist/psychologist-patient
> privilege, codified in section 5944 of the Judicial Code, 42 Pa.C.S.
> § 5944, applies to [the victim's] treatment at the [] Clinic is not
> necessary.[10]
>
> Accordingly, any oral communication by [the victim] in private
> to any member of her treatment team at the Horsham Clinic and
> used by the team for the purpose of psychotherapeutic evaluation is
> privileged, as well as any reference to such a communication in
> Horsham Clinic's files

*Id.* at 953–54 (emphasis in original) (citations omitted).

Having concluded that the victim's mental health records were protected by the MHPA

and not subject to disclosure under any of the enumerated exceptions in subsection 7111(a), the

*Segarra* court next examined whether the victim waived her privilege. *Id.* at 954. The court noted

that, in error, the Clinic disclosed the records to the Commonwealth without the victim's

consent. The *Segarra* court continued:

> As a general matter, once it is established that records are
> privileged from disclosure to third parties, the burden shifts to the
> party seeking disclosure to establish that an exception to the
> privilege exists which would allow the disclosure." *In re Fortieth*

---

[10] The *Segarra* court further noted, "[w]e point out, however, that the psychiatrist/psychologist-patient privilege is absolute and the statute contains no exceptions for disclosure . . . Moreover, "[i]n cases where the [section] 5944 privilege has been found to apply, case law has precluded material from being subjected to even *in camera* review by the trial courts[.]" *Id.* at 953-54 (citations omitted).

10

*Statewide Investigating Grand Jury*, 220 A.3d at 568 (citation omitted). Thus, the burden rests with Segarra to demonstrate that [the victim] waived the privilege conferred by statute.

As our Supreme Court recognized in *Zane*:

> [t]he importance of confidentiality cannot be overemphasized. To require the [h]ospital to disclose mental health records during discovery would not only violate [the patient's] statutory guarantee of confidentiality, but would have a chilling effect on mental health treatment in general. The purpose of the [MHPA] of seeking 'to assure the availability of adequate treatment to persons who are mentally ill,' 50 P.S. § 7102, would be severely crippled if a patient's records could be the subject of discovery in a panoply of possible legal proceedings. Moreover, to release such documents for review during discovery, only to have an appellate court reverse such decision on appeal, would result in the confidential nature of the records being forever lost.

*Zane*, 836 A.2d at 34 (emphasis added)

. . .

Our Supreme Court addressed the issue of waiver of privileged mental health records under section 7111 in *In re Fortieth Statewide Investigating Grand Jury*, *supra*. There, our Supreme Court observed that:

> [G]iven the strong legislative policy reflected in [s]ection 7111 [of the MHPA] to keep mental health treatment records confidential, implicit waiver of this privilege is strongly disfavored and has been recognized by our Court in only one circumstance — where a plaintiff initiated a civil action and sought to use [s]ection 7111 to shield disclosure of mental health treatment records, which he could reasonably have foreseen would be relevant given that his mental health was directly implicated by his cause of action. [*ex rel. Octave v. Walker*, 628 Pa. 128, 103 A.3d 1255 (2014)]. What was critical to our disposition in that case, however, was the fact that the individual asserting the privilege had placed his mental health at issue by initiating the case, and,

11

> thus, considerations of fundamental fairness were implicated, given that our Court did not want to countenance using this privilege as an "offensive" shield for a party to gain a tactical advantage in civil litigation. *Octave,* 103 A.3d at 1263.

*Id.* at 955 (some citations omitted).

Having conducted a thorough review of the relevant case law, the *Segarra* court concluded:

> These considerations are not present here, as this matter is not a civil case, [the victim] did not initiate the criminal case against Segarra, and when [the victim] sought mental health treatment as a sexual assault complainant, she could not have reasonably foreseen that the records of that treatment would be made available to her alleged perpetrator. As our Supreme Court held in *Fortieth Statewide Investigating Grand Jury,* we likewise "decline to extend the principle of implicit waiver recognized in *Octave* to circumstances such as those presented by the case at bar." *Id.* Thus, the Horsham Clinic's mistake in disclosing [the victim's] privileged mental health records to the Commonwealth is not an implied waiver of [the victim's] privilege. To hold otherwise would have a "chilling effect on mental health treatment in general" and would "severely cripple" the legislative purpose of ensuring confidentiality to those who seek it, including victims of sexual assault. Accordingly, Segarra has not met his burden of demonstrating [the victim] waived the privilege conferred by the MHPA.

*Id.* at 955-56 (citations omitted).

Thus, under *Segarra,* we must apply a three-part test to the instant facts. First, we must determine whether the statutory confidentiality privileges under the MHPA apply to the challenged records. Next, we must determine whether any of the enumerated exceptions apply. Finally, we must determine whether co-defendant waived the privileges conferred by the MHPA.

Regarding the first factor, we find the mental health records at issue fall squarely within the purview of the MHPA and are entitled to the protections therein. This finding is uncontested

12

by both parties. There is no dispute that the mental health records at issue were created and maintained pursuant to multiple Court Orders issued under the MHPA.

Having determined the MHPA applies, we must examine whether any of the exceptions enumerated in subsection 7111(a) apply.[11] As a threshold consideration, we note that it is uncontested that co-defendant did not give his written consent to release the records. Turning to the exceptions, the documents are not sought by one treating the person or by a county administrator, nor is there any suggestion that any treatment was undertaken in a federal agency. *See* 50 P.S. Sec. 7111(a)(1), (2), (4).

Further, "disclosure to a court is not permitted in criminal proceedings under the MHPA, rather, it is only permitted where the legal proceedings are authorized by the MHPA." *Segarra,* 228 A.3d at 952. Because the 7111(a)(3) exception only encompasses legal proceedings authorized by the MHPA, this exception does not serve as a basis to permit disclosure of co-defendant's records to Appellant in the criminal proceedings against Appellant and co-defendant. Thus, in this case, "by the plain language of the MHPA, all documents relating to [co-defendant's] mental health treatment authorized by Court Order under the MHPA shall be kept confidential and cannot be released to anyone absent co-defendant's written consent." *Id.* at 953.[12]

---

[11] In its Brief, the Commonwealth centers its arguments on the plain language of 50 P.S. Sec. 7402(e)(3), which reads, in relevant part: "Conduct of Examination; Report . . . Nothing said or done by such person during the examination may be used as evidence against him in any criminal proceedings on any issue other than that of his mental condition." As *Segarra* makes clear, the broad confidentiality provisions in Section 7111 offer blanket confidentiality protections applicable to all records created under the MHPA. As such, we recognize the applicability of 7402(e)(3) to the instant facts, but believe the protections afforded by Section 7111 provide the appropriate vehicle to resolve this case. Put another way, 7402(e)(3) compels the same result, but the *Segarra* framework for 7111 applies to all MHPA records, including the records here challenged.

[12] We note Appellant relies heavily on the United States Supreme Court's ruling in *Pennsylvania v. Ritchie,* 480 U.S. 39, 107 S.Ct 989 (1987). This argument was raised in *Segarra,* and the court disposed of it as follow:

> Ritchie was accused of committing rape and other sexual offenses against his minor daughter. Ritchie sought disclosure of the file of Pennsylvania's Children and Youth Services (CYS), the agency which investigated the suspected abuse

13

Finally, having concluded co-defendant's records are protected by the MHPA and not subject to disclosure under any of the enumerated exceptions in Section 7111(a), we examine whether co-defendant waived his privilege in the records. Appellant argues two competency evaluations were "admitted as exhibits in a hearing [and constitute] public judicial records." Brief in Support, 12/13/19, p. 3-4. As such, Appellant invokes the public right to access judicial records and argues the Commonwealth has not carried its burden to seal the records. *Id.* at 4. This argument lacks merit.

"As a general matter, once it is established that records are privileged from disclosure to third parties, the burden shifts to the party seeking disclosure to establish that an exception to the privilege exists which would allow the disclosure." *In re Fortieth*, 220 A.3d at 568. In this case, the burden rests with Appellant to demonstrate that co-defendant waived the privilege conferred by statute. As our Supreme Court recognized in *Zane*, "[t]o require . . . [disclosure of] mental health records during discovery would not only violate the patient's statutory guarantee of confidentiality, but would have a chilling effect on mental health treatment in general . . . [the

---

of the daughter. CYS claimed the records were privileged under Pennsylvania's Child Protective Services Law, 11 Pa.C.S. § 2215 (repealed). The High Court recognized the information was statutorily protected, but a majority of the Court determined that because the statute required CYS to disclose the information when directed by court order, it could not conclude "that the statute prevents all disclosure in criminal prosecutions." *Ritchie*, 480 U.S. at 43-44, 57-58, 107 S.Ct. 989. Thus, Ritchie was entitled to have the trial court review the CYS file to determine whether it contained information material to his criminal defense. Id. at 58, 107 S.Ct. 989.

**Here, in contrast to Ritchie, the language of the MHPA clearly shows that the legislature did not intend for a patient's mental health records to be subject to disclosure in criminal proceedings; the absence of such an exception shows the legislature has chosen to maintain the state's compelling interest in protecting the confidentiality of a patient's mental health records in criminal proceedings.**

*Segarra*, 228 A.3d at fn. 19 (emphasis added). As such, *Ritchie* did not invoke the MHPA, Appellant's reliance on same is misplaced, and any argument based thereon is without merit.

14

MHPA] would be severely crippled if a patient's records could be the subject of discovery." *Zane*, 836 A.2d 34.

Given the lack of written consent, the only viable argument here is implicit waiver, either by co-defendant himself, or by the Commonwealth. Implicit waiver of the MHPA confidentiality privilege, "is strongly disfavored and has been recognized by our [Supreme] Court in only one circumstance – where a plaintiff initiated a civils action and sought to use section 7111 to shield disclosure of mental health treatment records, which he could reasonably have foreseen would be relevant given that his mental health was directly implicated by his cause of action." *See ex. rel. Octave v. Walker*, 628 Pa. 128, 103 A.3d 1255 (2014).

Simply put, these considerations are not present here. This matter is not a civil case, co-defendant did not initiate the criminal case against Appellant, and when co-defendant was ordered by this Court into mental health treatment, he could not have reasonably foreseen that the records of that treatment would be made available in a criminal case against him. We decline to extend the principle of implicit waiver recognized in *Octave* to circumstances such as those presented in the case at bar. As such, co-defendant did not waive his privilege to the MHPA records in this case.

As the above discussion demonstrates, because co-defendant's mental health records are not subject to exception or discovery under the MHPA, and because co-defendant has not provided written consent to disclosure, the challenged records are statutorily protected from disclosure and *in camera* review. Thus, based on the foregoing, we believe co-defendant's mental health records under the MHPA are privileged and cannot be disclosed to anyone, or be

subjected to *in camera* review by anyone, without co-defendant's consent. Accordingly, Appellant's first issue on appeal is without merit.[13]

We have previously opined and decided on Appellant's second appeal issue—that this Court erred when it failed to grant Appellant's pretrial motion to dismiss pursuant to Pa. R. Crim. P. 600–in our August 16, 2021 Opinion and Order on Appellant's pretrial Motion. We attach same hereto and rely on our reasoning therein and find Appellant's second appeal issue without merit.

In his third appeal issue, Appellant argues this Court erred when it precluded Appellant from cross-examining the co-defendant on statements he had made during his mental health evaluations under the MHPA. This issue is without merit.

At trial, the following exchange took place during cross-examination of co-defendant Criste-Troutman:

> Attorney Closs, Appellant: And you would also sometimes claim to be Lucifer?
>
> Criste-Troutman: Yeah, they know me as Lucifer. They know me by my different names in different jails.

---

[13] We note that, on July 27, 2021, prior to trial, Appellant filed a *Motion for Transcripts* on co-defendant's docket. *See Commonwealth v. Criste-Troutman*, 1096-2018. In said *Motion*, Appellant requested a transcript of co-defendant's competency proceeding held that same day. By Order dated August 30, 2021, after hearing and review of the parties' briefs on the issue, this Court denied the *Motion for Transcripts.*

Initially, we note Appellant did not specifically raise a challenge to our denial of his *Motion for Transcripts* in his Concise Statement. As written, Appellant's sole challenge is to our January 7, 2020 Order denying his request for co-defendant's mental health treatment records under the MHPA. Thus, it is not clear that Appellant properly preserved a challenge to this issue.

Even assuming the challenge is preserved, the claim lacks merit and fails for the reasons previously discussed. The competency hearing at issue was conducted pursuant to the MHPA and a transcript of same constitutes protected records. The entirety of the competency proceeding was devoted to reviewing co-defendant's competency evaluation and his ability to stand trial within the meaning of the MHPA. A substantial portion of said competency evaluation was read verbatim on the record. To allow a hearing transcription of the otherwise protected competency report would constitute a statutorily barred end-around and run afoul of the strict confidentiality protections afforded by the MHPA. As such, any claim involving our denial of the *Motion for Transcripts* is waived, or, in the alternative, lacks merit.

16

Attorney Closs: And, you know, you talked to doctors and you told doctors that first you played crazy, but that didn't work and that that was essentially your attempt to escape responsibility for the charges. Correct?

Criste-Troutman: I wasn't playing crazy, man. If you . . .

Attorney Closs: That wasn't my question. My question was, you spoke to doctors, you told them that first you played crazy, but it didn't work and now you were going to take responsibility. Right?

Criste-Troutman: I guess so. I don't remember. I was in -- you can even ask my lawyer. I was in and out of it, man. I was bad. I was really, really bad.

Attorney Closs: So you don't remember talking to a doctor, T. David Newman?

Attorney Mancuso, First Assistant District Attorney: Objection, Your Honor. Can we approach?

The Court: Yes.

(The following colloquy occurred at sidebar)

Attorney Mancuso: Objection. At this point, Your Honor, it seems that Counsel is inquiring into things that may have come out at competency hearings, maybe evaluations, that sort of thing. I'm not sure about that, but the way the question was phrased, "Do you remember talking to your doctor," that would not be usable. I think we had this issue litigated, so I object.

The Court: I don't know where it's coming from, so why don't you explain that to me?

Attorney Closs: **Your Honor, two years ago we had a transcript from one of the competency proceedings. It's not the one we had the recent dispute over. We had that transcript for two years. So, it's one that we had and we still have. Attorney Mancuso is correct that I am attempting to cross on claims that were made in the transcript.**

The Court: And claims that he made to his doctor during the competency, the statement he --

Attorney Closs: What the doctor testified to about his claims.

17

The Court: Your objection is sustained. You may not cross on that.

Attorney Closs: Understood. So, Your Honor, for purposes of the record I believe Mr. Owens has a due process right to raise that and cross examine Mr. Troutman on that. So, that is the basis for –

The Court: I understand that. We've litigated that and I've made my decision on that issue.

*See* Notes of Testimony, Trial, Day 1, 9/14/21, pp. 195–97 ("N.T., Day 1, p. ____.") (emphasis added).

Based on the foregoing exchange, it is clear that Appellant sought to cross-examine co-defendant on his statutorily protected mental health records. Attorney Closs admitted this was his intent and the Court stated the issue had been previously litigated. As such, the MHPA records challenged in Appellant's third appeal issue are the same records challenged in his first issue. The distinction here is that the records were not sought in discovery; rather they were raised at trial on cross-examination, thus implicating Appellant's constitutional right to confrontation and due process. As such, we must determine whether the statutory privilege yields to Appellant's right to confrontation and his right to conduct effective cross-examination of the co-defendant.

The confrontation clause guarantees an accused the right "to be confronted with the witness against him; [and] to have compulsory process for obtaining witnesses in his favor." U.S. Const. Amend. VI. In *Herrick*, our Superior Court noted:

> The [federal] Confrontation Clause does not constitutionally guarantee access to pre-trial discovery. The right to confrontation is a trial right. A defendant does not have a right to discover any and all material potentially useful for impeaching a witness. "Generally speaking, the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, that the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 [ ]

18

(1985) (*per curiam*) (emphasis supplied) (citation omitted). Thus,
"the Confrontation Clause is generally satisfied when the defense
is given a full and fair opportunity to probe and expose these
[forgetfulness, confusion, or evasion] infirmities through cross-
examination...." *Id.* at 22, 106 S.Ct. 292 [ ].

*Commonwealth v. Herrick,* 442 Pa. Super. 412, 660 A.2d 51, 60 (1995) (some citations omitted).

There is no indication on the record that Appellant did not have a full and fair opportunity to

cross-examine the co-defendant. In fact, co-defendant, Criste-Troutman, was subject to a

thorough and probing cross-examination that addressed co-defendant's conflicting and

inconsistent prior statements. As such, denying Appellant access to co-defendant's protected

mental health records does not violate his right to confrontation.

Moreover, in *Segarra,* our Superior Court held a criminal defendant's constitutional

rights yield to the statutory privilege set forth in the MHPA. The court found, in relevant part:

> It should be readily apparent that the general powers of courts do
> not include the power to order disclosure of materials that the
> legislature has explicitly directed be kept confidential . . . Utilizing
> the same rationale, we arrive at the same conclusion: a criminal
> defendant's constitutional rights yield to the statutory privilege set
> forth in the MHPA. In creating the statutory privilege therein, the
> legislature obviously concluded there is a compelling interest in
> shielding mental health treatment records from disclosure except in
> limited circumstances. [] Notably, the legislature did not create an
> exception for disclosure in all legal actions or other proceedings.
> As *Moyer* [] made clear, disclosure in criminal proceedings is not
> among the MHPA's exceptions.
>
> The very existence of the unambiguous legislation of the MHPA
> signifies the strength of the privilege, and the legislature clearly
> determined that disclosure of mental health treatment records in
> legal actions or other proceedings is only relevant in involuntary
> and voluntary mental health commitment proceedings. [The] clear
> mandate of the statutory privilege under the MHPA is not
> overcome even by the constitutional rights of a criminal defendant.

19

*Segarra*, 228 A.3d at 559-60 (quotations and citations omitted).

Thus, based on the foregoing, and in accordance with the plain language of the MHPA, Criste-Troutman's mental health records are absolutely privileged. Courts do not have "the power to order disclosure of materials that the legislature has explicitly directed be kept confidential." *Id.* at 960 (citations omitted). Appellant's constitutional right to confrontation and due process were not violated and yield to co-defendant's statutory privilege under the MHPA. As such, the reasoning and analysis discussed attendant to Appellant's first appeal issue, *supra*, controls Appellant's third appeal issue. The records are privileged, Appellant was not permitted to cross-examine co-defendant on the records at trial, and Appellant's third appeal issue is without merit.

Appellant's fourth appeal issue has not previously been addressed in a written Opinion or Order by this Court, however, the record shows that the issue is also without merit. Appellant alleges this Court erred when it overruled 404(b) objections made at trial to statements that Appellant had previously 'beat a body,' and 'had killed before and knew how to get away with it.' The challenged evidence was offered at trial through Detective Thomas McAndrew and Detective Sergeant Wendy Serfass.

The first relevant exchange involves the direct examination of Detective McAndrew by Attorney Mancuso and relates to McAndrew's interview of co-defendant Criste-Troutman, after which McAndrew authored a report. Initially, Criste-Troutman stated he acted alone in committing the murder; however, on further questioning, Criste-Troutman implicated Appellant. The report contained statements regarding Appellant's past involvement in a New York City homicide. The report noted the co-defendant's stated belief that Appellant knew how to kill and get away with it – and that this reputation induced the co-defendant to seek Appellant's help in

20

committing the instant homicide. Appellant's counsel reviewed the report prior to trial and

believed the contents would be introduced through the testimony of McAndrew. The exchange,

in relevant part, is as follows:

> Detective McAndrew: I said to Randy – I said, your dad seems convinced that you would never do anything like this by yourself, that you would need some backup . . . and Randy said – he said, you're right. I did have somebody.
>
> Attorney Mancuso: Was that the first time after that interview that he mentioned there was somebody helping him?
>
> Detective McAndrew: Correct.
>
> Attorney Mancuso: And what happened after he made that admission to you.
>
> Detective McAndrew: Well, he elaborated a little bit on it.
>
> Attorney Closs, counsel for Appellant: Your Honor, may be approach?
>
> The Court: Yes.
>
> (The following discussion was held on the record at sidebar outside the presence of the jury).
>
> Attorney Closs: Your Honor, the Commonwealth's question is sort of leading to 404(b) evidence at this point in the interview. The trooper is going to relate things about the [Appellant] beating a body and the murder in New York, etcetera []. This was something that was discussed in the interview with the Trooper. We had filed an objection to 404(b) evidence. Your Honor had set a time frame for them to file notice of the 404(b) evidence.
>
> The Court: I don't think there was notice of 404(b).
>
> Attorney Closs: There was not, Judge.
>
> Attorney Mancuso: This isn't 404(b), but I'll wait until counsel goes through that.
>
> Attorney Closs: [The 404(b) notice] was due May 1st . . . [i]t is 404(b) evidence, Judge, because it's referencing that -- the fact that

21

it's mentioned in a case doesn't mean that it's not 404(b). It's still 404(b) evidence. So we're objecting to that. The Commonwealth had an opportunity to argue about it and present why they believe it was admissible, which was the direction of Your Honor's order.

. . .

The Court: Let me understand specifically what this is, because there is not a notice filed; so I don't really know.

Attorney Mancuso: Yea, I was going to ask what specifically counsel is objecting to with reference to the report that the witness prepared that he's claiming this 404(b) evidence. I think there's a clear distinction here. I think I know what he's asking, but I want to make sure I'm clear before I respond.

The Court: Why don't you have the report for me to look at?

Attorney Mancuso: Sure, I have it Judge . . . It's in the bottom paragraph. There's a reference referring to Hollow having avoided being convicted in connection with a New York City murder. And if you notice in my note, Judge, I crossed that out.

The Court: You're not intending to ask him that?

Attorney Mancuso: No. But – and I don't believe it's 404(b) – the sentence before that, because it already came out in testimony with Randy Criste-Troutman. It was even talked about in opening by the Commonwealth. The reasons allegedly why Randy Criste-Troutman wanted the [Appellant] to back him up was because [Appellant], quote, "beat a body before." And [co-defendant] testified that the [Appellant] held himself out as someone who could kill and get away with it. That is not 404(b).

The Court: Right. The [Appellant] said he could kill him, but the second part of that says avoided being convicted and him mentioning the New York City murder.

Attorney Mancuso: Right. And I'm not using that.

Attorney Closs: Your Honor, it's also referencing he beat a body before.

Attorney Mancuso: Well, that's the street term . . . for what he actually did testify to and what was in opening, that he held himself out as someone who could kill and get away with it. I think

22

he even said kill somebody.

The Court: The street term meaning not that he beat a conviction, but that he physically beat a body.

Attorney Mancuso: No, that he got away with killing somebody. So he killed somebody and got away – it doesn't say he was charged or arrested or acquitted . . . [w]e're not going to be referring to that as a fact in any way, just the reason he gave to why he wanted to partner up with [Appellant].

The Court: Randy Criste-Troutman believed this to be true.

Attorney Mancuso: Right. Well, even if he didn't believe it to be true, that's what he said.

The Court: That was his reasoning.

Attorney Mancuso: Yeah.

The Court: Okay. Go ahead. You address that.

Attorney Closs: . . . . even if [] Randy Criste-Troutman is saying that that's the purpose or the hint or how he set it up. It's still 404(b) evidence . . . and I'd ask for it to be excluded.

Attorney Mancuso: It is the annotation of the Trooper in his report that would constitute 404(b) evidence, specifically, saying that there was a New York City murder . . . that's not what we're eliciting. And the clear reason – and a 403 objection is different than a 404(b). Counsel is really raising a 403 objection. But it's not even unduly prejudicial at this point, because the [] co-defendant had been subjected to a lengthy cross-examination, questioning the veracity of his statement, his flip-flops, his motives for coming up with this story, for why he fold [Appellant] into play. And this supports the belief he had, as communicated to the police back in prior consistent statements, as to why he wanted [Appellant] to help him.

The Court: Your objection is noted for the record. It's overruled, with that caveat.

*See* Notes of Testimony, Trial, Day 3, 9/16/21, pp. 37–45 ("N.T., Day 3, p. ____.")

Following this exchange, Attorney Mancuso continued questioning Detective

23

McAndrew. The sole exchange made in the presence of the jury that implicated the above-challenged evidence was as follows:

> Trooper McAndrew: Yeah, Randy at that point told us that he sought the assistance of an individual who went by the street name of Hollow [Appellant].
>
> . . .
>
> Attorney Mancuso: Okay. So after that, how did the version of the events surrounding the murder – how did that change?
>
> Detective McAndrew: It was a similar situation. The ruse to get the victim into the wooded area would have been this robbery that they were going to pull off, but now [Appellant] is along for the ride. That was Randy. To make him more comfortable, make sure something didn't go wrong, he wanted to use [Appellant] because **[Appellant] had beat a body before**, and he just felt more comfortable with having somebody else along. So they take the victim down in the vehicle.

*Id.* at 45-46 (emphasis added).

Thus, despite the lengthy conversation at sidebar regarding Detective McAndrew's report, the only challenged reference by McAndrew at trial was the statement that Appellant was known to Criste-Troutman as having "beat a body before." In other words, McAndrew relayed co-defendant's belief that Appellant had killed before and knew how to get away with it.

The second relevant exchange involves the direct examination of Detective Sergeant Wendy Serfass by Attorney Mancuso. During the course of the investigation, co-defendant agreed to conduct a taped 'ride-along' interview where he accompanied Detective Serfass and Trooper Kowalski to the scene of the crime and recounted his version of events. At trial, Detective Serfass read portions of the transcript of the ride-along, marked as Commonwealth's Exhibit 62, into the trial record. The relevant portion involved co-defendant recounting his return to the scene of the crime with Appellant to burn the body of the Victim. The recitation of the ride-along transcript prompted defense objection, and reads, in relevant part:

24

Detective Serfass: Yes, [co-defendant] spoke of the day's events several times through the drive-along.

Attorney Mancuso: So with that in mind, the second reading will be from page 60 of Commonwealth's 62, line 7, to page 67, line 11.

(From the Transcript of Commonwealth's Ex. 62, page 66, line 5, to page 67, line 7) (in relevant part).

Randy Criste-Troutman: [Appellant was] like it's just better if you just burn it, because, you know what I mean, like you can get rid of everything . . . I did wanna bury it [] but he didn't wanna – he didn't wanna be out there that long. Cause I wanted to move the body, I wanted to move it . . . Cause I had thought personally, you know, this is too close to the house . . . I was like, yo, let's move the body . . . **And [Appellant was] like, nah, because he's like, yo, I've done this stuff before, uhm, you know what I mean? And I know about homicide or whatever, you know, if you move it up there, if you touch it or whatever, that's how you get caught, that's how you get caught, so you just burn it.**

(Stop reading of Commonwealth's Ex. 62)

Attorney Closs: Your Honor, may we approach?

The Court: Yes

(The following discussion was held on the record at sidebar outside the presence of the jury)

Attorney Closs: Your Honor, the section under 404(b) and 403, I ask for a mistrial. This is in reference – I think the Commonwealth said it was going to be about maybe beating a body, and it's gone way beyond that in this – what they just introduced in the transcript. I think that's very, very prejudicial to [Appellant] and doesn't comply with the Court's directions about giving notice about this sort of thing, and we would ask for a mistrial.

Attorney Mancuso: Again, this is similar to the other statements consistent with that. There was no mention of any actual prosecutions, convictions, acquittals. None of that was involved in this. It was why they chose to burn the body rather than bury it, based on the advice allegedly given by [Appellant] to his [co-defendant]. Also, I've been careful to announce ahead of time each of the passages that were going to be read. This transcript was first

25

introduced into evidence yesterday. So I think that the notice would be not applicable at this point for the Defense to claim surprise. And they had this transcript in discovery for, I'd say, the better part of the year. So I believe it's consistent with the Court's prior ruling. It's part of the same course of conduct between the parties. And [co-defendant] appeared and was subject to full and lengthy cross-examination about multiple statements he made both during the prior intercept and prior to that in his interview with the State troopers.

The Court: Am I correct this was one of the transcripts that you cross-examined Criste-Troutman on?

Attorney Closs: Yes, we've had this transcript, I don't dispute that.

The Court: I'm asking specifically. You used, I think, four different transcripts to cross-examine Criste-Troutman, and I'm just asking if this was one of them?

Attorney Closs: That is true Judge, yes. The thing we didn't have notice about is what passages Attorney Mancuso was going to read in. He never told us . . .

Attorney Mancuso: Okay. In response to that, Judge, it came out as early as the testimony with Mr. Criste-Troutman [on day 1 of trial] both on direct and I believe on cross, where he said [Appellant] knows how to kill people or kill someone and get away with it. So it's part and parcel of that. It's I picked him because he viewed a body before. It's consistent with the Court's prior ruling. It was already inquired by the Defense. It's two parts to it. I know how to kill someone, part one, and get away with it, part two, this is part of the get-away-with-it aspect. And again, it's not pointing to specific prior instances, bad conduct to show any type of propensity. It doesn't go to 404(b). Again, this transcript was in Defendant's possession for at least a year, if not long[er].

Attorney Closs: We've had a pending objection on 404(b). We filed it in the omnibus. It was held pending the Commonwealth's filing of notice, which they did not do.

The Court: Your motion for mistrial is denied and your objection is overruled.

*See* Notes of Testimony, Trial, Day 4, 9/17/21, pp. 5-8 ("N.T., Day 4, p. _____."),

Commonwealth Exhibit 62, pp. 66-67.

26

In sum, Appellant challenges two statements made at trial in the presence of the jury and admitted into evidence over objection of defense counsel: (1) Trooper McAndrew's recollection that co-defendant stated he enlisted Appellant's help because he had "beat a body before;" and (2) Detective Serfass' on the record recital of a drive-along transcript in which co-defendant stated Appellant had "done this stuff before . . . [that he knew] about homicide . . . [that he knew] how you [got] caught," and that he suggested burning the body would prevent same.[14]

Admission of evidence is within the sound discretion of the trial court. *Commonwealth v. Collins*, 888 A.2d 564, 577 (Pa. 2005). "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa. R.E. 402. Relevant evidence is defined as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence . . . and . . . the fact is of consequence in determining the action." Pa. R.E. 401. In addition, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa. R.E. 403. Thus, Rule 403 vests the trial court with authority to determine the admissibility of the evidence with an eye towards "clear, concise, and expeditious presentation, allowing for the exclusion of evidence that is confusing, cumulative, or unfairly prejudicial." *Farese v. Robinson*, 222 A.3d 1173, 1186 (Pa. Super. 2019).

As a threshold concern, we decline to agree with Appellant's characterization of the challenged statements as 404(b) evidence. The evidence at issue was not evidence that Appellant had committed a prior murder; rather, the evidence reflected Criste-Troutman's state of mind or

---

[14] We note Appellant raised a third 404(b) objection at trial; however, said objection was raised when the Commonwealth offered the transcript of the ride-along into evidence. As such, our review of the actual reading of the challenged ride-along transcript encompasses both the earlier preemptory 404(b) challenge and the 404(b) objection raised at the time the transcript was read into the record. *See* N.T., Day 3, p. 171.

27

belief that Appellant had done so. This is a key distinction, as it places the challenged evidence outside the purview of Rule 404(b). Criste-Troutman did not establish that Appellant had committed a prior bad act, his statements merely established that he believed Appellant had done so. In turn, this belief motivated Criste-Troutman to seek Appellant's help in planning, carrying out and concealing the murder. Simply put, the statements were not evidence of a crime, wrong, or other act; rather, they merely demonstrated Criste-Troutman's state of mind and provided context on the relationship between the two men.

Importantly, as the foregoing trial testimony makes clear, the Commonwealth and the Appellant were aware of the reference to Appellant having avoided conviction in a New York City murder. All references to prior charges, prosecution and any potential acquittal were excluded from reference at trial. By way of analogy, if person A lies and tells person B he killed before and knows how to get away with it, there is no actual crime, wrong or other act that would implicate 404(b). Person B would have the belief that Person A killed before, but that belief, in and of itself, would not constitute 404(b) evidence. This case presents analogous facts with one caveat: there was, in fact, some evidence that Appellant had been involved in a New York City murder. However, the critical distinction is that this evidence was never discussed at trial – the Commonwealth explicitly avoided reference to it. As such, from the perspective of the jury, the foregoing analogy controls and the challenged statements merely demonstrate state of mind, not actual crimes, wrongs or other acts subject to 404(b).

Turning to relevancy, we believe the statements were relevant under Pa. R.E. 401. In this case, conspiracy was charged, and both Appellant and co-defendant were charged as principal and accomplice. As such, Criste-Troutman's belief that Appellant had carried out a similar crime was relevant to establishing a motive for seeking Appellant's help, and also to prove the two men

28

acted in concert with the design of killing the Victim and burning his body to escape responsibility. Criste-Troutman's belief provided a theory of the case and a narrative that brought the two men together to carry out this crime. In addition, assuming Appellant held himself out as an experienced killer, this fact also establishes Appellant's state of mind and his reason for engaging in planning and preparatory activities that led to the homicide. Because the challenged evidence is relevant, it is likewise admissible under Pa. R.E. 402.

Next, we apply the Pa. R.E. 403 balancing test which assumes presumptive admissibility of evidence. Given the short duration of the challenged testimony, we find it did not impact the court's efficiency, and does not implicate the concepts of undue delay, waste of time or cumulative evidence contemplated in the Rule. In addition, we believe the probative value of the evidence was not outweighed by the danger of unfair prejudice. For the reasons discussed, the evidence was highly probative and provided important narrative context to the jury in considering both Appellant's and co-defendant's motive for participating in the crime. We recognize some potential for prejudice is inherent in a statement suggesting a belief that an individual previously committed a crime; however, the prejudicial effect of the challenged statements did not outweigh their probative value.

First, the statements were made in passing and constitute an inconsequential portion of the testimony heard at trial by the jury. The Commonwealth did not ask follow-up questions or draw undue attention or scrutiny to the statements. Moreover, Criste-Troutman made a similar reference to Appellant's reputation in his direct examination. *See* N.T., Day 1, p. 69. Following this, he was subject to thorough cross-examination and Appellant had ample opportunity to question him regarding this statement. During cross, Appellant questioned the veracity of co-defendant and noted the flip-flops and inconsistencies in his prior statements. As such, the

29

challenged evidence was also probative in proving that co-defendant made prior consistent statements that supported his explanation for brining Appellant into the fold.

Next, there were no specific allegations presented in the statements. The phrase "beat a body" is ambiguous and the notion that Appellant knew about homicide and had "done this stuff before" is totally absent of specific reference to any crime or prior bad act. The statements were merely a reflection of Criste-Troutman's state of mind and did not constitute evidence of actual crimes committed. Finally, Appellant received Trooper McAndrew's report and the ride-along transcript well in advance of trial, and any argument of undue surprise is mitigated by this fact. Based on the foregoing, we believe the probative value of the challenged evidence outweighs any potential for prejudice.

Although we believe the inquiry ends with Rule 403, we note that, even assuming the challenged evidence constitutes Pa. R.E. 404(b) evidence, it is nonetheless permissible. Pennsylvania Rule of Evidence 404(b) states, in pertinent part:

> Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character . . . [but] may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice.

Pa. R.E. 404(b)(1), (2).

In *Commonwealth v. Sherwood,* 603 Pa. 92, 982 A.2d 483 (2009), our Supreme Court summarized the relevant law in this area as follows:

> Generally, evidence of prior bad acts or unrelated criminal activity is inadmissible to show that a defendant acted in conformity with those past acts or to show criminal propensity. Pa. R.E. 404(b)(1). However, evidence of prior bad acts may be admissible when offered to prove some other relevant fact, such as motive,

> opportunity, intent, preparation, plan, knowledge, identity, and
> absence of mistake or accident. Pa. R.E. 404(b)(2). In determining
> whether evidence of other prior bad acts is admissible, the trial
> court is obliged to balance the probative value of such evidence
> against its prejudicial impact.

*Id.* at 114, 982 A.2d at 497 (citation omitted). Furthermore, the exceptions listed in Rule 404(b) are non-exhaustive. Indeed, relevant to the present matter, courts have also recognized another exception—*res gestae*—to give essential background information to the crimes on trial. *See Commonwealth v. Reid*, 99 A.3d 427, 451 (Pa. 2014). Thus, the Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts. *Commonwealth v. Stanley*, 484 Pa. 2, 7, 398 A.2d 631, 633 (1979).

Even if evidence falls within one of the exceptions, the probative value of the evidence must outweigh its potential for unfair prejudice. Rule 404(b)(2). Unfair prejudice is defined as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Rule 403, cmt. All evidence against a defendant in a criminal case will be prejudicial. *Commonwealth v. Peer*, 684 A.2d 1077, 1083 (Pa. Super. 1996). Our determination in this context, however, must be whether evidence is *unfairly* prejudicial. *Id.; see also* Rule 404(b)(2). While the trial court must exclude relevant but unfairly prejudicial evidence, we are "not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts form part of the history and natural development of the events and offenses with which [a] defendant is charged." *Commonwealth v. Owens*, 929 A.2d 1187, 1191 (Pa. Super. 2007) (quotation omitted). In order for it to be excluded, relevant evidence must be "so prejudicial that it would inflame the jury to make a decision based upon

31

something other than the legal propositions relevant to the case." *Id.* (quotation omitted).

Having determined the challenged evidence is relevant, and assuming 404(b) applies, we now turn to the 404(b) exceptions. We believe the *res gestae* exception provides the strongest support for admissibility. The Pennsylvania Supreme Court has consistently recognized that admission of distinct crimes may be proper where it is part of the history or natural development of the case, *i.e.*, the *res gestae* exception. *Commonwealth v. Brown*, 52 A.3d 320, 26 (Pa. Super. 2012). In *Commonwealth v. Lark*, our Supreme Court further articulated this exception:

> The '*res gestae*' exception to the general proscription against evidence of other crimes is also known as the 'complete story' rationale, i.e., evidence of other criminal acts is admissible 'to complete the story of the crime on trial by proving its immediate context of happening near in time and place.

543 A.2d 491, 497 (Pa. 1988). The *res gestae* exception "is necessary[y] [to admit] acts which are so clearly and inexorably mixed up with the history of the guilty act itself as to form part of one chain of relevant circumstances, and so could not be excluded on the presentation of the case before the jury without the evidence being rendered thereby unintelligible." *Commonwealth v. Coles*, 108 A. 826, 827 (Pa. 1919). Thus, *res gestae* allows admission of prior bad acts evidence when it forms part of the chain or sequence of events leading to the crime at issue, figures in the history of the event, or was part of the natural development of the facts. *Commonwealth v. Gooding*, 629 A.2d 722 (Pa. 1994).

In this case, Criste-Troutman's belief that Appellant had killed before and gotten away with it was the spark that lit the fuse of this crime. Criste-Troutman admitted he didn't have the experience or wherewithal to commit the crime. As such, he turned to Appellant for help because he believed Appellant had experience in committing a similar act. Criste-Troutman's belief formed the first link in the chain of events leading to the crime. It was the singular point at which

32

the history of the case unfolded and explained the context and natural development of the case to the jury. Without this fact, Criste-Troutman and Appellant were loosely affiliated individuals with no common interests. Once this fact was introduced, it provided context to the plan, preparation, and eventual execution of the crime at issue. Simply put, Criste-Troutman's belief brought the two men together to commit murder. As such, the challenged statements satisfy the *res gestae* exception to 404(b).

Having found that this bad acts evidence is relevant and admissible under the *res gestae* exception, we must now balance its probative value with its prejudicial effect upon the Appellant. Even if evidence falls within one of the 404(b) exceptions, the probative value of the evidence must outweigh its potential for unfair prejudice. Pa. R.E. 404(b)(2). Unfair prejudice is defined as "a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." Rule 403, cmt.

As stated previously, the evidence of Criste-Troutman's state of mind was highly probative of the *res gestae* of the case. Without explaining the background, the jury would have no context for why Appellant would be involved in the murder. Conversely, the prejudicial impact of the two statements was limited. Criste-Troutman was subject to a lengthy and probing cross-examination where he was questioned on numerous past conflicting statements and other evidence that drew his credibility into question. Criste-Troutman admitted he was often not credible, suffered from various mental health conditions, and had lied frequently in the past to investigators. As such, two passing references to Appellant made to Detectives McAndrew and Serfass did not amount to the kind of severely prejudicial evidence contemplated under 404(b)(2). Thus, we do not believe that the admission of highly probative evidence concerning Criste-Troutman's state of mind would be "so prejudicial that it would inflame the jury to make a

33

decision based upon something other than the legal propositions relevant to the case." *Owens,* 929 A.2d at 1191.

Continuing our Rule 404(b) analysis, Appellant claims that introduction of the evidence was a violation of the notice requirement of Rule 404(b)(3), which states that in a criminal case "the prosecutor must provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence the prosecutor intends to introduce at trial." Pa. R.E. 404(b)(3). The notice need not be in writing for the evidence to be admissible. *Commonwealth v. Lynch,* 57 A.3d 120, 126 (Pa. Super. 2012). Nor need the notice be formally given. *See id.* (finding that the facts listed in the affidavit and the testimony at the preliminary hearing put defendant on notice that the prior bad acts would be introduced at trial). The requirement is designed to prevent unfair surprise and give defendants time to prepare an objection or rebuttal. *Commonwealth v. Hicks,* 91 A.3d 47, 53 (Pa. 2014). Further, the rule only requires that Appellant be informed of the general nature of the evidence, not what specific witnesses and documents would be admitted. Pa. R.E. 404(b)(3).

Here, Appellant, knowing and accepting that he was to be tried for conspiracy with a coconspirator, had ample time to prepare an objection or rebuttal to the evidence. *Hicks,* 91 A.3d at 53. Appellant was in possession of Detective McAndrew's report and the transcript of Detective Serfass' 'ride-along' with co-defendant far in advance of trial and had time to prepare objection or rebuttal to same. Based on this, any argument of unfair surprise is without merit. In addition, Appellant had ample opportunity to cross-examine co-defendant about any and all of the statements he made prior to trial. As such, the spirit of Rule 404(b)(3) was satisfied. Likewise, when objections were raised during trial, the court held discussion at sidebar outside the presence of the jury to hear the arguments of counsel. Based on these arguments, the Court

34

determined the Commonwealth did not intend to introduce 404(b) evidence and thus demonstrated good cause to admit the statements.

In addition, we do not believe a limiting or cautionary instruction was required in this case. First, for the above-discussed reasons, we believe this evidence was relevant, satisfied Rule 403, and did not invoke the protection afforded by rule 404(b). Even assuming the evidence was 404(b) evidence, Appellant did not request a limiting instruction. As such, any potential conflict with Pa. R.E. 105 is nullified and this argument is without merit. *Commonwealth v. Williams*, 950 A.2d 294, 320 (Pa. 2008) (defendant may be entitled to limiting instruction to protect against impermissible inferences of propensity if instruction requested by trial counsel).

Finally, even assuming the admission of the contested statements was improper, the error was harmless.[15] An erroneous ruling by a trial court on an evidentiary issue does not require an appellate court to grant relief where the error is harmless beyond a reasonable doubt. *Commonwealth v. Northrip*, 945 A.2d 198, 203 (Pa. Super. 2008). Harmless error exists where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was

---

[15] In *Commonwealth v. Fitzpatrick*, our Supreme Court made clear that a sufficiency analysis and a harmless error analysis are governed by separate and distinct standards, stating in relevant part:

> [A] sufficiency analysis and a harmless error analysis are not the same, and require different evaluations of the evidence. In a sufficiency review, the appellate court must review the evidence in the light most favorable to the Commonwealth, and must draw all reasonable inferences for the Commonwealth. On the other hand, when reviewing for harmless error, the appellate court considers only the uncontradicted evidence and, having done so, proceeds to determine whether that body of uncontradicted evidence was so overwhelming that the erroneous admission of the evidence could not have impacted the verdict. These two inquiries are not the same.

255 A.3d 452, 470 (Pa. 2021) (citations omitted).

35

> so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Fransen*, 42 A.3d 1100, 1113 (Pa. Super. 2012). A mistrial may only be granted where the error complained of "is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." *Commonwealth v. Johnson*, 107 A.3d 52, 77 (Pa. 2014).

Here, the prejudice to Appellant was, at most, *de minimis*. For the reasons stated above, Criste-Troutman was not a credible witness and provided multiple conflicting accounts of the events of the case. As such, two passing references to Appellant's reputation were inconsequential in light of the other evidence presented at trial. Moreover, the statement in Detective McAndrew's report that Appellant had "beat a body" was ambiguous and the meaning of same was likely outside the understanding of the jury.

In addition, the properly admitted and uncontradicted evidence of guilt was overwhelming. Here, the uncontradicted evidence established that on March 16, 2016, McMichael's Hunting Club members discovered burnt human remains on State Game Lands 38, later identified as Demetrio Hughes. N.T., Day 2, pp. 130-32. An autopsy on the Victim determined that the cause of death was a gunshot wound to the head. *Id.* at 124. On March 21, 2016, Pennsylvania State Troopers conducted an interview with Randy Criste-Troutman at the Lackawanna County Prison. He related the Victim was an associate of his in dealing heroin and owed him in excess of $1,000.00 for illegal drugs. N.T., Day 1, p. 98. Criste-Troutman related that he used a ruse to lure the victim into the woods in order to kill him. *Id.* at 54-55, 57-60. Specifically, Criste-Troutman told the Victim they would commit a home invasion robbery and the Victim agreed to participate. *Id.* Criste-Troutman further related that Michael Owens helped

36

lure the victim with the robbery ruse. *Id.* Criste-Troutman related that Appellant shot and killed the Victim in the woods. *Id.* at 66.

On April 26, 2016, Appellant gave sworn testimony to the Monroe County Investigating Grand Jury. During his testimony, Appellant admitted to knowing the Victim, and knew the Victim and Criste-Troutman to be associates. Moreover, Appellant knew Criste-Troutman was involved in the sale of illegal drugs, specifically heroin. Appellant related that Criste-Troutman contacted him and asked to help drop off a friend. Appellant stated that he picked up Criste-Troutman and was advised that the Victim was that friend. Appellant related that he drove Criste-Troutman and the Victim to a wooded area, that Criste-Troutman and the Victim exited the vehicle, and that after a period of time Criste-Troutman returned alone. Appellant advised that he returned to the same spot with Criste-Troutman between one and three days later. Appellant further advised Criste-Troutman brought a gas can filled with gasoline on the return trip. *See* N.T., Day 5, pp. 6-40, Commonwealth Exhibit 70.

Finally, cell phone tracking evidence supports finding that: (1) Appellant accompanied Criste-Troutman and the Victim to the scene of the murder on the date the murder occurred; (2) Appellant and Criste-Troutman returned to the scene of the crime that night; and (3) Appellant and Criste-Troutman returned to the scene of the crime three days later. N.T., Day 4, pp. 177-190. Moreover, Appellant and Criste-Troutman were in frequent contact via text message communications during this time period. *Id.* at 168-69.

Based on the foregoing, Appellant admitted to accompanying Criste-Troutman and the Victim to the woods where the Victim was killed. Cell phone tracking data indicates Appellant and Criste-Troutman returned to the scene of the crime later that night. In addition, Appellant admitted that he took Criste-Troutman back to the scene three days later and brought a can of

37

gasoline. Given the Victim was shot and killed in the woods, and that his body was burned three days later, the uncontradicted evidence of guilt was overwhelming. As such, any potential error in admitting the challenged statements was harmless.

For the foregoing reasons, we believe Appellant's appeal issues lack merit and the judgment of sentence should be affirmed. Nothing further remains to be determined at this time.

BY THE COURT:

MARGHERITA PATTI-WORTHINGTON, P.J.

cc:  Michael Mancuso, Esq., First Assistant District Attorney
     Matthew Bernal, Esq., Assistant District Attorney
     Eric Closs, Esq., Counsel for Appellant
     Michael Owens, Appellant
     Clerk of Courts
     Prothonotary—Superior Court

Clerk of Courts KS
FEB 7 '22 PM 2:04

38